UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOHN R. GRAHAM,                      )
                                     )
          Plaintiff,                 )
                                     )
      v.                             )          No. 4:11 CV 58 DDN
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
          Defendant.                 )

**MEMORANDUM**

This action is before the court for judicial review of the final decision of defendant Commissioner of Social Security denying the applications of plaintiff John R. Graham for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423, and for supplemental security income under Title XVI of that Act, 42 U.S.C. § 1382.  The parties have consented to the exercise of plenary authority by the undersigned United States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the court affirms the decision of the Administrative Law Judge (ALJ).

**I. BACKGROUND**

Plaintiff, who was born in 1950, filed applications on July 2, 2009, alleging a January 1, 2004 onset date, due to coronary artery disease (CAD), peripheral vascular disease, chronic obstructive pulmonary disease (COPD), hypertension, seizure disorder, post traumatic stress disorder (PTSD) arising from military service in Vietnam, recurrent syncope episodes, and high cholesterol.  (Tr. 119-21, 162.)  His claims were denied initially, on reconsideration, and after a hearing before an ALJ.  (Tr. 9-17, 52-54, 56-61, 64-67.)  On November 13, 2010, the Appeals Council denied his  request for review.  (Tr. 1-3.)  Thus, the decision of the ALJ stands as the final decision of the Commissioner.

**II. MEDICAL HISTORY**

From February 19-20, 2009, Graham was admitted to the Veterans Administration Medical Center (VA) for chest pain and hypertensive

urgency.   The physician noted a history of CAD, two angioplasty procedures and stenting, hypertension, hyperlipidemia or high blood cholesterol, and seizure disorder.   The physician opined his pain could have been induced by the stress of his wife's death on January 29, 2009. He was administered medications.   His anti-seizure medication was not restarted due to a history of non-compliance.   (Tr. 419-22.)

On February 27, 2009, upon referral, Graham saw psychologist Patrice Pye, Ph.D., for mood disturbance and anxiety following his wife's death three weeks earlier.   He reported suicidal ideation a few days prior. Dr. Pye noted a tearful mood, anxiety, low mood, sleep disturbance, poor concentration, low energy, and occasional suicidal ideation.   She diagnosed "complicated bereavement."   (Tr. 1098-1100.)

On March 11, 2009, Graham was seen at the VA for cervical back pain and other complaints.   He reported neck pain radiating to the low back, and was taking Vicodin and Tramadol.   His other medications included Naproxen, a non-steroidal anti-inflammatory drug, and Metoprolol and Enalapril, both used to treat high blood pressure.   Cervical and thoracic imaging studies revealed degenerative changes and suggested spondylitis or inflammation of the spinal vertebrae.   The physician's impression was degenerative joint disease (DJD).   Graham was advised to exercise, lose weight, and stop smoking.   (Tr. 1089-91.)

On March 13, 2009, Graham was seen at the VA for an initial consultation and psychiatric appointment with a psychiatrist, Antonina Gesmundo, M.D.  He had been experiencing anxiety and depression following his wife's death.   Graham reported trouble sleeping, poor appetite, low energy, lack of interest in doing anything, and crying a lot.   Dr. Gesmundo noted depressed and dysphoric or sad mood, as well as blunted affect or lack of emotional reactivity.   He was 5 feet 5inches tall and weighed 252 pounds.   Dr. Gesmundo diagnosed depression and anxiety and assigned a Global Assessment of Functioning (GAF) score of 60, indicating "moderate" symptoms.   (Tr. 1082-89; American Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th Ed. 2008) (DSM-IV)).

On March 18, 2009, a colonoscopy revealed hemorrhoids and diverticulosis or the presence of diverticula or pouchlike sections in

the colon.    (Tr. 1072-73.)    On March 26, 2009, VA records from a
hypertension consultation noted a history of coronary artherosclerosis,
benign hypertension, shoulder pain, back pain, DJD, anxiety, and
transient ischemic attack (TIA), which occurs when blood flow to a part
of the brain stops for a brief period of time.  (Tr. 1066.)

On April 9, 2009, Graham was seen at the VA for cardiac and other
conditions.  (Tr. 1061.)  He was diagnosed with chest pain and unstable
angina.  He was prescribed Plavix, used to prevent strokes and heart
attacks; Hydrocodone, a narcotic analgesic used to relieve pain and
cough; and Naproxen.  (Tr. 1063.)

Also on April 9, 2009, Graham had a suicidal ideation and plan,
including thoughts of cutting his wrists with a knife.  (Tr. 1059-60.)
He reported feelings of depression since his wife's death.  (Tr. 1030.)
He denied any history of depression prior to his wife's death.  He was
also very stressed over circumstances with his son who had recently moved
in with him after being released from prison and who was being very
disrespectful of him.  He stated "he just couldn't take it anymore."
(Tr. 1030.)

At the advice of his psychologist, Lauren Mensie Ph.D., he was
admitted to the VA on April 9, 2009 for severe major depressive disorder
where he stayed until April 13, 2009.  (Tr. 408-09.)  His GAF score was
40 at the time of admission, which indicates impairment in reality
testing or communication, or major impairment in several areas, such as
work or school, family relations, judgment, thinking, or mood.  DSM-IV
at 34.   His GAF score was 50 at discharge, representing "serious"
symptoms.  (Tr. 409-10; DSM-IV at 34.)

From April 28 through May 8, 2009, Graham was again admitted to the
VA for chest pain and suicidal ideation.  He reported experiencing chest
pain during the two weeks prior to admission.  He was a pack-a-day
cigarette smoker for 40 years.  Notes state he had started drinking
whiskey daily.  He was monitored for suicidal thoughts.  He was placed
on medication and his mental status gradually improved, i.e., his mood
was better.  He was attending support groups and was compliant with
medications.  He was discharged into his own care.  His diagnoses upon

- 3 -

discharge included bereavement, adjustment disorder with depressed mood, and alcohol abuse.

On May 6, 2009, his GAF score was 61, and on May 7, it was 45.   (Tr. 395-407, 893.)

Graham saw Dr. Mensie again on May 11, 2009 for grief related issues.  His mood was "mildly" dysthymic or depressed.  He denied hopelessness and was future oriented.  He had strong family support and appropriate help-seeking behavior.  He was instructed to return for follow-up.  (Tr. 866-68.)  He was also seen in the chiropractic clinic that day.  An X-ray of his lumbosacral spine showed mild low back osteoarthritis. (Tr. 1219-22.)

From May 18 to 19, 2009, Graham was admitted to the VA hospital for CAD.  He reported shortness of breath, nausea, and frequent panic attacks.  He underwent outpatient cardiac catheterization.  He was discharged on Plavix, used to prevent heart attacks and strokes, and scheduled for follow-up. (Tr. 393-95.) He continued with follow-up from May through July 2009.  (Tr. 686-810, 812.)

From June 20 to 23, 2009, Graham was admitted to St. John's Mercy Hospital for low blood pressure and syncopal or fainting episodes, particularly when getting up from a seated position.  He reported multiple syncopal episodes over the past several months.  A CT scan of the brain was compatible with prior strokes.  Doctors opined his psychiatric medications might have been contributing to his low blood pressure. He did not have any apparent seizure activity.  His discharge diagnoses were syncope; hypotension or low blood pressure; dehydration; acute renal failure; seizure disorder; CAD; hypertension; PTSD; tobacco dependence; dyslipidemia or abnormalities in lipids or lipoproteins in the blood; and a probable old cerebrovascular accident.  He was instructed to stay hydrated, to use his air conditioning, and to stop smoking.  His condition upon discharge was "good." (Tr. 311-13.)

On August 25, 2009, Graham was seen for a psychological follow-up. He described his mood as "good," but reported a low mood one to two weeks earlier.  He also reported passive thoughts of death during the week prior but denied any thoughts of suicide. (Tr. 1282-84.)

- 4 -

On September 22, 2009, Graham was seen for psychological follow-up, reporting that his mood was "real good." His affect was "bright." (Tr. 1273.) He had good social support from his family. He had purchased a dog, met a new girlfriend, was researching employment opportunities, and had applied for social security income. He was more animated and upbeat than in earlier sessions, which his therapist opined was probably due to his new girlfriend. He continued to experience low energy and concentration problems. (Tr. 1272-74.)

During a November 13, 2009 neurological evaluation, Graham reported that he was doing "OK"; that he was unable to stand more than 20 minutes at a time due to back pain; and that he had 15 seizures in the last four months. The diagnostic impression was post traumatic seizures. His medications were adjusted and he was instructed to follow-up in three months. (Tr. 1270-72.)

On November 15, 2009, Graham was seen for a laceration to his left hand, sustained while skinning a deer. The laceration was sutured, and the sutures removed two weeks later. (Tr. 1169-77.)

On November 20, 2009, Graham saw Dr. Mensie for follow-up for his issues with grief and depression. At that time he had not had any thoughts of suicide for months. He described himself as "really happy." He denied any symptoms of depression, any problems with anxiety, and reported "stable" functioning. (Tr. 1269.) He reported occasional times when he felt down and had low motivation. Dr. Mensie noted improvement in Graham's mood and discussed coping strategies. Dr. Mensie noted that Graham's therapeutic goals of mood stabilization and maintaining his safety had been accomplished, and that he did not have any new goals for therapy. He denied any distress and reported regular use of healthy coping strategies. He declined to schedule a follow-up appointment and would instead return as needed. (Tr. 1268-69.)

Graham next saw Dr. Mensie on February 1, 2010. Dr. Mensie noted a mildly dysthymic or depressed mood, among other things. Records note continued difficulties with concentration. Graham discussed a recent argument with his son on the anniversary of his wife's death. He described a recent suicidal ideation with a vague plan but no intent. He stated that he had coped with the ideation by keeping a journal of his

feelings, which he found helpful.  The plan was to follow-up in one week by telephone.  (Tr. 1263-65.)

On February 1, 2010, Dr. Mensie prepared a Mental Medical Source Statement (MSS).  Concerning activities of daily living, Dr. Mensie indicated moderate limitation with functioning independently and behaving in an emotionally stable manner; marked limitation with coping with normal stress; and no limitation in adhering to basic standards of neatness and cleanliness.  Regarding social functioning, Dr. Mensie indicated moderate limitation relating to family and peers, interacting with the public, and maintaining socially acceptable behavior.  She noted marked limitation with accepting instructions and criticism and with requesting assistance.  Regarding concentration, persistence or pace, Dr. Mensie indicated moderate limitation with respect to making simple and rational decisions and sustaining an ordinary routine without special supervision, and marked limitation maintaining attention and concentration for extended periods and responding to changes in the work setting.  (Tr. 1181-84.)

Dr. Mensie opined that Graham would require three or more absences per month and would arrive late or leave early from work at least three times per month.  She diagnosed recurrent major depressive disorder, noting his two hospitalizations for suicidal ideation in 2009.  She opined that while Graham's functioning had become more stable since that time, it would still negatively impact his ability to maintain employment.  Dr. Mensie did not complete the section in the MSS addressing "sustained and regular performance," noting that she could not provide this information  because doing so would require guessing.  (Tr. 1181-84.)

Graham continued to be seen at the VA for his various conditions during February and March 2010.  (Tr. 1185-1263.)  On April 16, 2010, he was seen in the emergency room (ER) at Missouri Baptist Sullivan Hospital following a seizure the night before.  The ER physician advised Graham that his Dilantin level was low, called the VA about his condition, and advised Graham to go to the VA that day.  (Tr. 1296-300.)

- 6 -

**Testimony at the Hearing**

On June 30, 2010, Graham appeared and testified to the following at a hearing before an ALJ.  (Tr. 23-50.)  He has an eighth grade education. He has past work in asbestos removal, construction, doing line work in a factory, and as a janitor.  (Tr. 26-27, 47.)

He has back problems, shoulder pain, and seizures.  He has had two heart attacks and a stroke.  Medication does not always control his blood pressure.  He has received mental health treatment, including therapy after having suicidal thoughts.  He has had approximately 40 seizures within the prior year, and takes his anti-seizure medication regularly. He uses an inhaler for his cardiac condition and for shortness of breath. He smokes a pack of cigarettes per day.  (Tr. 28-36.)

He cannot walk for more than about 20 minutes due to shortness of breath.  He can stand for only about 15 minutes.  He cannot lift a gallon of milk repeatedly.  He has constant pain in his legs and back and takes sleep medication.  He naps for an hour or so about four days per week. He gets depressed and anxious, particularly when in crowds.  He smokes marijuana occasionally for pain.  (Tr. 37-44.)  He denied that he was a hunter or that he had ever had an accident involving a knife.  (Tr.  43.)

Vocational Expert (VE) Delores Gonzales also appeared and testified at the hearing.  The ALJ asked the VE to assume a hypothetical individual of Graham's age and educational background who could lift and carry 20 pounds occasionally and 10 pounds frequently; stand or walk for six out of eight hours; sit for six hours; and occasionally climb stairs, ramps, ropes, ladders, and scaffolds.   The individual could understand, remember, and carry out simple instructions to non-detailed tasks, respond appropriately to supervisors and co-workers, adapt to routine simple work changes, and take appropriate precautions to avoid hazards. In response, the VE testified that the individual could perform Graham's past relevant work (PRW) as a production assembler.  (Tr. 47-48.)

The ALJ then asked the VE to assume a hypothetical individual with the limitations set forth by Dr. Mensie.  The VE testified that employment would be precluded under that hypothetical.  (Tr. 48-49.)

### III.  DECISION OF THE ALJ

On August 27, 2010, the ALJ issued an unfavorable decision.  (Tr. 9-17.)  At Step One, the ALJ found that Graham had not engaged in substantial gainful activity since March 11, 2009, the date after a prior ALJ decision, or after January 1, 2004, his alleged onset date.  (Tr. 12.)

At Step Two, the ALJ found that Graham had severe impairments of obesity, CAD, cardiogenic syncope, degenerative disc disease of the lumbar spine, major depressive disorder, polysubstance abuse, and PTSD. At Step Three, the ALJ found that Graham did not suffer from an impairment or combination of impairments of a severity that meets or medically equals the required severity of a listing.  (Tr. 12.)

Prior to Step Four, the ALJ found that Graham had the RFC to perform "light" work as defined in the regulations, with additional restrictions. He could stand for six hours out of eight, and walk/stand for six out of eight hours.  He could lift and carry 20 pounds occasionally and 10 pounds frequently.  He could occasionally climb stairs, ramps, ropes, ladders, and scaffolds.  He could understand, remember, and carry out simple instructions and non-detailed tasks; respond appropriately to supervisors and co-workers; adapt to routine/simple changes; and take appropriate precautions to avoid hazards.  (Tr. 13.)

The ALJ gave little weight to Dr. Mensie's opinion that Graham's depressive symptoms negatively impacted his ability to maintain employment, specifically noting that it was inconsistent with her progress notes and that it did not factor in the effects of alcohol and marijuana abuse.  The ALJ also noted Dr. Mensie's description of Graham's mental conditions as "stable."  (Tr. 15-16.)

The ALJ found Graham not credible, based upon his substance abuse, as well as inconsistencies with his testimony and the record evidence. (Tr. 16.)  At Step Four, the ALJ found Graham able to perform his PRW as a production assembler.  The ALJ therefore found Graham not disabled under the Act.  (Tr. 16-17.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and is supported by substantial evidence in the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.   42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d 935, 942 (8th Cir. 2009).  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. § 404.1520(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942 (same).

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform his PRW.  Id.  The claimant bears the burden of demonstrating he is no longer able to return to his PRW.  Id.  If the Commissioner determines the claimant cannot return to PRW, the burden shifts to the Commissioner

- 9 -

at Step Five to show the claimant retains the RFC to perform other work.
Id.

## V. DISCUSSION

Plaintiff argues the ALJ erred in determining his RFC by failing to include appropriate limitations supported by the record; failing to cite and describe medical evidence in support of his RFC determination; and arriving at unsupported medical conclusions.  He also argues the ALJ's credibility finding is not supported by substantial evidence.  The court disagrees.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record.  Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000).  RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations.  Donahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001); 20 C.F.R. § 416.945(a).  While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional.  Lauer, 245 F.3d at 704.  An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."  SSR 96-8p, 1996 WL 374184, at * 7 (Soc. Sec. Admin. July 2, 1996).

Following a review of the evidence, including Dr. Mensie's treatment notes, the court concludes substantial evidence on the record as a whole supports the ALJ's RFC finding.  The court also finds the ALJ properly discredited Dr. Mensie's opinion.

In her MSS, Dr. Mensie opined that Graham's ability to cope with normal stress, accept instructions or respond to criticism, ask simple questions or request assistance, respond to changes in the work setting, and maintain attention and concentration for extended period was "markedly" limited.  (Tr. 1181-82.)  The record evidence, however, fails to support marked limitations in those areas.  Dr. Mensie's treatment

notes show that while Graham experienced grief, depression, and anxiety following his wife's death, and from his son moving in with him following his son's release from prison, he was handling coping fairly well. (Tr. 405-06, 1059.)

The record evidence shows Graham had normal concentration in April and August 2009, and only "mild" difficulties with concentration in September and November 2009. (Tr. 1030, 1035, 1045, 1268, 1273, 1283.) He could read and obey simple commands. (Tr. 998.) Other evidence also shows that Graham answered questions appropriately and could follow one, two, and three step commands. (Tr. 613.) Graham testified that he could concentrate. (Tr. 45.) Dr. Mensie's progress notes repeatedly state that Graham denied hopelessness and suicidal plans or intent. (Tr. 601, 621, 805-07, 998, 1002-03, 1070, 1076-77, 1237, 1239, 1244, 1253-54, 1257, 1259, 1264,1268, 1273, 1283, 1285, 1291.) He was alert and oriented, pleasant and cooperative, and "future oriented." (Tr. 601, 621, 807, 999, 1002, 1004, 1076, 1237, 1240, 1244, 1253, 1257, 1265, 1268, 1273, 1283, 1285, 1291). Dr. Mensie also repeatedly noted that Graham had a history of "appropriate help-seeking behavior," indicating that he was able to ask questions and seek assistance. (Tr. 80, 808, 1244, 1253, 1268-69.)

In her MSS, Dr. Mensie further opined that Graham was moderately limited in his ability to function independently; behave in an emotionally stable manner; relate to family, peers, or caregivers; interact with strangers or the general public; maintain socially acceptable behavior; make simple and rational decisions; and sustain an ordinary routine without special supervision. (Tr. 1181-82.) However, record evidence shows that, despite Graham's grief, his thought process, recent and remote memory, and general fund of knowledge were normal. (Tr. 592-93.) Dr. Mensie's notes from August and September 2009 state that Graham was researching employment opportunities, and spending time with his family and new girlfriend. (Tr. 1273, 1283.) Evidence from November 2009 shows that Graham's mood and affect, speech, behavior, judgment, thought content, cognition, and memory all were "normal." (Tr. 1169-72.)

- 11 -

Graham was also advised to socialize with peers and attend group therapy, indicating that he could relate to peers, interact with strangers, and maintain socially acceptable behavior. (Tr. 593.) He responded "quickly" to the supportive environment of group therapy. (Tr. 407.) Dr. Mensie's notes from November 2009 also reflect that Graham was encouraged to maintain a moderate activity level with daily structure. (Tr. 1269.) Graham himself testified that he did not have problems making friends or with interpersonal relationships. (Tr. 44.)

The court concludes that the evidence therefore indicates that Graham can behave in an emotionally stable manner; relate to family, peers, and care givers; interact with strangers; maintain socially acceptable behavior; make simple and rational decisions; and sustain an ordinary routine without special supervision.

An ALJ may reject the opinion of any medical expert that is inconsistent with the medical record as a whole. See Estes v. Barnhart, 275 F.3d 722, 725 (8th Cir. 2002). The court concludes that the ALJ here properly noted that Dr. Mensie's opinion is inconsistent with her own treatment notes, and therefore appropriately discredited her opinion. See 20 C.F.R. § 404.1527(d)(2)(2011)(treating physician's opinion must be supported by credible and persuasive evidence); Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005)(generally, an ALJ is obligated to give controlling weight to a treating physician's medical opinions that are supported by the record).

Graham also argues the ALJ substituted his own medical opinion in rejecting Dr. Mensie's, and failed to cite other medical opinion evidence in support. This argument is without merit. As stated above, the ALJ bears "the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence." Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). That said, a claimant's RFC is a medical question and "at least some" medical evidence must support the ALJ's RFC determination. See Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001). As set forth above, Dr. Mensie's notes reflect that Graham is capable of understanding, remembering, and carrying out simple instructions and non-detailed tasks, responding appropriately to others, adapting to change, and taking precautions to avoid hazards.

- 12 -

Graham also argues that the ALJ failed to include the physical limitations with lifting, standing, and walking about which he testified. The ALJ discussed the record evidence prior to concluding that Graham was not credible. (Tr. 16.)  The ALJ determined that Graham had the RFC to lift and carry 10 pounds frequently and 20 pounds occasionally;  sit six hours; walk/stand six hours; and occasionally climb stairs, ramps, ropes, ladders, and scaffolds. (Tr. 13.)

This court finds no controlling substantial evidence reflecting physical limitations beyond those found by the ALJ.  For instance, Graham testified to back problems.  However, the record evidence from July and August 2009 shows that straight leg raising was negative; his response to sensation was intact; and his gait, posture, heel walking, toe walking, tandem walking, motor strength, and lower limb functional testing were normal. (Tr. 1213, 1232.)  Graham never underwent back surgery, injections, chiropractic care, physical therapy, or used a TENS unit for his pain. (Tr. 28, 1211.)  A claimant's statement about pain or other symptoms does not, by itself, establish disability.  See 20 C.F.R. §§ 404.1529 and 416.929 (2011).  There must be medical signs and laboratory findings showing a medical impairment which could reasonably be expected to produce the symptoms alleged and which, when considered with all of the other evidence, would lead to the conclusion that the claimant is disabled. (Id.) See also Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003)(lack of supporting objective medical evidence is one factor in evaluating credibility); Kelley v. Callahan, 133 F.3d 583, 589 (8th Cir. 1998)(allegations of disabling pain properly discounted because of inconsistencies such as minimal or conservative medical treatment).

Other record evidence also detracts from Graham's credibility. Graham testified that he had approximately 40 seizures during the previous year. (Tr. 33.) However, doctors opined that these events were not seizures, but episodes of syncope or fainting that were not caused by his neurological condition, but by hypotension, a low heart rate, dehydration, and changes to medication. (Tr. 28, 312, 445, 651, 665-66.) Graham was also smoking marijuana "almost every day" and was advised to stop. (Tr. 1228-29.)

The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not for the court. See Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). If the ALJ discounts a claimant's credibility and gives good reasons for doing so, the court will defer to ALJ's judgment even if every factor is not discussed in depth. See Brown v. Chater, 87 F.3d 963, 966 (8th Cir. 1996). Because the ALJ here articulated the inconsistencies on which he relied in discrediting Graham's testimony regarding his subjective complaints, and because the credibility finding is supported by substantial evidence on the record as a whole, the ALJ's credibility finding is affirmed. See Pena v. Chater, 76 F.3d 906, 908 (8th Cir. 1996).

## VI.  CONCLUSION

For the reasons set forth above, the court finds that the decision of the ALJ is supported by substantial evidence in the record as a whole and consistent with the Regulations and applicable law. The decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.


                            /S/    David D. Noce
                     **UNITED STATES MAGISTRATE JUDGE**


Signed on March 5, 2012.


- 14 -